**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **MARIA ONTIVEROS, individually and** | § | |
| **as next friend of MODESTO** | § | |
| **ONTIVEROS, deceased; MARTHA** | § | |
| **DURAN; MODESTO ONTIVEROS JR.;** | § | |
| **AND ERICKA ZAMORA,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:06-cv-3293** |
| | § | |
| **CITY OF ROSENBERG, CHIEF OF** | § | |
| **POLICE ROBERT GRACIA, AND** | § | |
| **OFFICER DEWAYNE LOGAN,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**MEMORANDUM AND ORDER**</u>

Pending before the Court is Defendants' Motion for Summary Judgment. After considering the parties' filings and the applicable law, the Court finds that the motion, Docket No. 39, should be **GRANTED** as to Plaintiffs' claims under 42 U.S.C. § 1983**.** Plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE.**[1]

**I.     BACKGROUND**

**A.     The Lawsuit**

Plaintiffs, survivors of Mr. Modesto Ontiveros, have brought this case under 42 U.S.C. § 1983, alleging that Defendant Officer Dewayne Logan used excessive force when he shot and killed Ontiveros during the execution of an arrest warrant. Plaintiffs additionally maintain that Chief of Police Robert Gracia and the City of Rosenberg are liable for Officer Logan's actions because the City, through Chief Gracia, ratified Officer Logan's conduct by failing to punish him

---

[1] Plaintiffs initially asserted state law claims against Defendants, but indicate in their response to the pending motion that they no longer wish to pursue their state law claims in this Court. Their request to dismiss those claims without prejudice will be granted.

and by promoting him after he shot and killed Ontiveros.[2]  Defendants argue that summary judgment is appropriate because the summary judgment record establishes that Officer Logan did not use excessive force against Ontiveros and because Officer Logan is entitled to qualified and official immunity.  Defendants further contend that the summary judgment record shows that neither Chief Gracia nor the City of Rosenberg is liable under § 1983 either because Ontiveros was not subjected to a constitutional violation or because Chief Gracia and the City did not cause any constitutional deprivation.

Each of the conflicting allegations and arguments will be considered in detail.  Neither the parties' contentions nor the Court's reasoning however, should obscure the fact that a horrific tragedy has occurred.  Still, the task assigned to the Court is not simply to express its sympathy, but to decide its cases.

**B.    Facts**

**1.    Events Prior to the SWAT Team's Entry**

Defendants assert, and Plaintiffs do not specifically deny, that the following events occurred in the 24 hours before the City of Rosenberg Police SWAT team entered Mr. Modesto Ontiveros' home.  Around midnight on Saturday, October 16, 2004, Ontiveros was involved in a fight with James and Joel Arellano, who were friends of Glafiro Rodriguez.  Ontiveros instigated the fight, but left after he was struck by the Arellanos.  According to Rodriguez, who was present for the fight, on the way to his van, Ontiveros talked about coming back with a gun to kill the Arellanos.  (Rodriguez Aff. Ex. jj.)  At approximately 10:00 a.m. the next morning—Sunday, October 17, 2004—Ontiveros went to the house where Rodriguez and the Arellanos lived, kicked the door, yelled for Rodriguez to come outside, and said that he was going to kill the

---

[2] Plaintiffs also asserted claims against Chief of Police Robert Gracia in their Amended Complaint.  In their response brief and at a hearing on the pending motion, Plaintiffs clarified that they no longer wish to allege a claim against Chief Gracia.

Arellanos.  When Rodriguez came outside, Ontiveros hit him in the back of the head with a revolver, causing Rodriguez to fall to the ground bleeding.  Ontiveros put the barrel of the gun to Rodriguez' ribs and said "I want to hurt you."  He then struck Rodriguez in the face with the gun and said he would return later to kill the Arellanos. After Ontiveros returned home, he told his friend Francisco Lara[3] about the assault and test fired his rifle.  Ontiveros' son, Modesto Jr., then reloaded the rifle for him and Ontiveros and Lara left the house  again.

Ontiveros and Lara returned to Rodriguez' home around noon that day.  Rodriguez, the Arellanos, Valentine Cruz, and two other men were out in the yard.  Ontiveros got out of his van with his rifle in his hand and a handgun in the waistband of his pants.  Mr. Cruz reported that Ontiveros also had a bottle of whisky in his hand. Ontiveros pointed the rifle at the men and again threatened to kill the Arellanos.  At some point, Ontiveros handed the rifle to Lara, who also pointed it at the men.  According to one of the men present in the yard, Ontiveros claimed that he could kill the Arellanos and flee to Mexico, and said he had done so before.  Ontiveros and Lara then got back in the van and left.

Rodriguez and the Arellanos reported the events to the Rosenberg police, the police investigated the allegations, and a Fort Bend County magistrate judge issued felony warrants authorizing the arrest of both Ontiveros and Lara on charges of aggravated assault with a deadly weapon.  Chief of Police Robert Gracia authorized the use of the City of Rosenberg Police SWAT team to serve the warrants, which is the City's preferred method of serving what they believe to be high risk warrants.  Police considered the warrants for Ontiveros and Lara high risk because the suspects had been involved in a violent altercation earlier in the day, had threatened people with a pistol and a rifle, may have been drinking, and were believed to be capable of

---

[3] Francisco Lara was also known as Frank Ayala and is refered to as Ayala in several documents in the summary judgment record.

using the weapons.  There is no evidence in the summary judgment record that Ontiveros had previously been convicted of a violent crime.  The Rosenberg Police conducted surveillance of Ontiveros' residence, and determined that his vehicle was at the home.  Prior to approaching the residence, Sergeant Kenny Seymour briefed the SWAT team, which included Officer Logan. The SWAT team was aware of the violent nature of Ontiveros' alleged crimes, the fact that the suspects were likely armed with a rifle and a revolver, and the fact that Ontiveros might be intoxicated.  The members of the SWAT team also discussed the tactics they planned to use in serving the warrants.

### 2.    Entry and Shooting

According to the summary judgment record, the events leading up to the shooting of Mr. Ontiveros occurred as follows. [4]  When the SWAT team approached the mobile home, the door was already slightly open.  Sgt. Seymour announced "Police" and called for Ontiveros to come to the door, but received no response.  (Seymour Aff. 0144.)   Detective Slater also claims that he yelled "Police" in Spanish.  (Cook Report 0361.)  A member of the team then pushed the door open further.  Sgt. Seymour observed Lara in the hallway to the right of the door and ordered him to come outside, but he turned to move away.  Seymour then commanded the SWAT team to enter the mobile home and take Lara into custody.  According to dispatch reports, the team made entry at 9:07:16.  Two detectives entered and detained Lara in the hallway.  Sergeant Seymour then moved into the living room and saw someone close the door to the master

---

[4] The record evidence has been provided primarily by Defendants.  In addition to the discovery carried out for this lawsuit, the record includes the findings of an investigation carried out by Texas Ranger Sergeant Jeff Cook. The City of Rosenberg called Ranger Cook to investigate the incident the night of the shooting.  Ranger Cook interviewed all of the SWAT team members, including Officer Logan, and conducted a video walk through of the shooting with Officer Logan and Sgt. Seymour.  He also conducted a forensic examination of the residence and examined the coroner's report and autopsy photos.  The record also includes depositions of Ranger Cook and Officer Logan conducted by Plaintiffs.  The Court is aware of its obligation to consider the factual allegations in the light most favorable to Plaintiffs when entertaining a motion for summary judgment.  Plaintiffs do not provide an alternative narrative, however, except to generally argue that the material events "could not have occurred" as Officer Logan describes and as the investigative report accepts.

bedroom on the west end of the mobile home.  Sgt. Seymour claims he shouted "come out" and "police."  (Seymour Aff. 0144.)  The only light on in the mobile home was the master bathroom light.  Because of this lighting, Sgt. Seymour was able to observe the silhouette of someone's feet under the master bedroom door.

Officer Logan was the fourth officer to enter the mobile home; he entered a few seconds after the SWAT team initially made entry.  Officer Logan saw that two officers had detained Lara on the floor and saw Sergeant Seymour moving through the kitchen towards the bedroom door.  Sgt. Seymour told Officer Logan that someone was behind the bedroom door.  Officer Logan then proceeded past Sgt. Seymour, who remained behind and to the right of Officer Logan, near a laundry room.  As Officer Logan approached the door, he was carrying a pistol with a tactical light on it.  Sgt. Seymour instructed Officer Logan to kick the door open.  When Officer Logan first kicked the door, it did not open.  Sgt. Seymour then told Officer Logan that someone was standing behind the door and he was going to have to kick it harder.  (Defs' Mot. Summ. Judg. Ex. B at 0347.)  Officer Logan claims that he believed Ontiveros was barricading the door.  Logan then kicked the door at least 2 more times before it opened slightly.

Officer Logan claims that when the door opened, he saw Ontiveros standing two or three feet in front of him holding an object over his head.  He was illuminating Ontiveros with the tactical light on his pistol.  According to Logan, Ontiveros then moved away from Logan and behind the door.  Officer Logan  then took a step back and peeked around the door.  Officer Logan claims that he then saw the object that had been over his head in Ontiveros' left hand.  Officer Logan could not tell at that point what the object was.  Officer Logan yelled, in  English, "let me see your hands" more than once.[5]  Officer Logan continued to peek around the door and

---

[5] Officer Logan testified that the SWAT team was not sure about Ontiveros' ability to speak English.  (Logan. Dep. 88.)  Officer Logan does not claim that he gave these commands in Spanish.

claims he saw Ontiveros try to put his hand in the object, which, at this point, he believed to be a boot.  Officer Logan states that he continued to shout "let me see your hands," but Ontiveros refused to do so.  According to Officer Logan,  because he believed that Ontiveros might be reaching for a weapon in the boot, he fired two shots.  Ontiveros then said something to the effect of "Ahh, you got me, Amigo," and moved in front of the doorway.  Officer Logan stated that, when he shot him, Ontiveros was standing and holding his boot in his left hand in front of his chest.  A subsequent autopsy report, acknowledged in the City of Rosenberg Police Internal Affairs Report, found that Ontiveros was leaning forward at the waist or kneeling at the time he was shot.[6]  No other member of the SWAT team was able to see Ontiveros in the bedroom.  Although Officer Logan believed that Ontiveros had the boot in his hand when he was shot, he did not have the boot in his hand when he moved in front of the doorway after the shooting.  The dispatch record reflects that an officer called "shots fired." at 9:07:24.  Thus, approximately eight seconds passed from the time the SWAT team made entry into the mobile home to the time that Officer Logan  shot Ontiveros.

Officer Logan then pushed Ontiveros down, and officers behind him secured the suspect.  Officer Logan states that he continued to search the room, looked in the boot, which was on the floor near where he shot him, and saw that it was empty.   No weapons were found in the bedroom.  Officer Logan claims he only saw one boot in the room.  Sergeant Tim Bruce was standing behind Officer Logan in the hallway and entered the bedroom immediately after the shots were fired.  Sgt. Bruce did not see a weapon,  but did report seeing a pair of buckskin boots with blood on them, and remembered that one boot was on its side.  (Cook Report 444.) Officer

---

[6] Plaintiffs argue that the autopsy photos also provide evidence that Ontiveros' left arm was bent at the elbow and was held out in front of him.

Logan spoke with Sgt. Seymour outside the home after the shooting and told him "I thought the subject was going to shoot me.  I shot him."

Sgt. Seymour summoned emergency medical service personnel for Ontiveros.  Ontiveros was taken to Hermann Hospital in Houston where he later died from a gunshot wound to his left arm and chest.

Officer Logan was placed on administrative leave for approximately six weeks.  During that time, the shooting was investigated by Texas Ranger Jeff Cook, the Rosenberg Police Department Internal Affairs Unit, and a Fort Bend County Grand Jury.  The Grand Jury failed to indict Officer Logan for the shooting.  Chief of Police Gracia subsequently allowed Officer Logan to return to work and later promoted him to Lieutenant.

## II.    ANALYSIS

### A.    Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.");  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court generally

views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Crawford*, 234 F.3d at 902.  The Court resolves "factual controversies in favor of the nonmoving party, however, only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts."  *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).  Conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-248.

If the moving party pleads in good faith that it is entitled to absolute or qualified immunity, "the burden shifts to the plaintiff to rebut it."  *Cousin v. Small*, 325 F.3d 627, 632 (5th Cir. 2003) (internal citations omitted).  Thus, "[t]he burden is on a plaintiff to overcome a defendant's defense of qualified immunity.  *Burnes-Toole v. Byrne*, 11 F.3d 1270, 1274 (5th Cir. 1994).

**B.      Section 1983**

42 U.S.C. § 1983 "imposes liability upon 'every person' who, under color of state law or custom, 'subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Owen v. City of Independence, Missouri*, 445 U.S. 622, 635 (1980); *see also Piotrowski v. City of*

*Houston*, 51 F.3d 512, 515 (5th Cir.1995).  "Section 1983 'is not itself a source of substantive

rights,' but merely provides 'a method for vindicating federal rights conferred elsewhere.' "

*Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3

(1979)).  In this case, Plaintiffs argue that Mr. Ontiveros was deprived of his Fourth Amendment

right "to be secure . . . against unreasonable seizures"  *Graham v. Connor*, 490 U.S. 386, 394,

395 ("[A]ll claims that law enforcement officers have used excessive force . . . in the course of

an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard .

. . .").

       Applying *Graham*, the Fifth Circuit has held that, to prevail on a § 1983 excessive force

claim, a plaintiff must show:  "(1) an injury (2) which resulted directly and only from the use of

force that was clearly excessive to the need and (3) the force used was objectively unreasonable."

*Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999) (internal citations omitted).  This case

clearly involves an injury that resulted directly and only from the use of force.  The question that

remains is whether the force used was clearly excessive and objectively unreasonable.  *See Reese

v. Anderson*, 926 F. 2d 494, 500 (5th Cir. 1991).

       Determining whether the use of force is reasonable under the Fourth Amendment

"requires careful attention to the facts and circumstances of each particular case, including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

flight."  *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).   Even

though the Court must consider the evidence in the light most favorable to Plaintiffs, the

reasonableness of the use of force is to be judged "from the perspective of a reasonable officer

on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 at 396 (citing *Terry*

*v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see also Ballard v. Burton*, 444 F.3d 391, 402-03 (5th Cir. 2006).  The Court must allow for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 397.  The officer's underlying intent or motivation is irrelevant:  "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Id.* (internal quotations and citations omitted); *see also Pierce v. Smith*, 117 F.3d 866, 871 n. 5 (5th Cir. 1997).  Where an officer defendant is the sole surviving witness, "'a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial.'"  *Bazan v. Hidalgo County*, 246 F.3d 481, 492 (5th Cir. 2001) (citing *Plakas v. Drinski*, 19 F.3d 1143, 1147) (7th Cir. 1994)).

Where an officer reasonably believes that a suspect poses an immediate threat to himself or others, the use of deadly force does not violate the Fourth Amendment.  *See, e.g.*, *Fraire v. City of Arlington,* 957 F.2d 1268, 1280 (5th Cir. 1992) ("Nothing in *Garner* prohibits an officer from using deadly force in self-defense when the officer has probable cause to believe that the suspect poses a threat of serious physical injury or death to the officer."); *Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985) ("If Young's movements gave Olson cause to believe that there was a threat of serious physical harm, Olson's use of deadly force was not a constitutional violation."); *see also Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) ("A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)).

C.      **Analysis of Constitutional Violation**

The question of whether Officer Logan's use of force was reasonable turns on whether the events occurred in the way Defendants describe.  After careful consideration of the record and arguments presented by the parties, the Court concludes that Plaintiffs have failed to provide evidence sufficient to establish a genuine issue of material fact as to how the events occurred.

Plaintiffs argue that Officer Logan's account of the events is not credible and that there is "no way" that the events could have occurred as Officer Logan alleges.  (Pls' Resp. to Mot. Summ. Judg. 24.)  It is undisputed that only eight seconds passed from the time of the SWAT team's initial entry into Ontiveros' home and the time that "shots fired" were reported.  Plaintiffs claim that this timeframe casts the "greatest doubt" on  Officer Logan's story and suggests that Officer Logan likely shot Ontiveros before he perceived whether or not he was a threat.  (Pls' Resp. to Mot. Summ. Judg. 25.)  Unfortunately, Plaintiffs provide no evidence to support their theory that the events in the mobile home could not have taken place in eight seconds.  Plaintiffs point to no contradictions in the testimony from Officer Logan or any of the other officers that would suggest that the events did not occur as Officer Logan claims.  Although Ranger Cook, who conducted an independent investigation of the shooting, testified that he believed it would be "close" for all of the events to occur in eight seconds, he also went on to say that "it's very possible that it could have happened in eight seconds."  (Cook Dep. 45-46.)  Plaintiffs concede that their expert witness, Ernest Burwell, "has no eight second theory," but contend that they need no "time expert" because common sense dictates that eight seconds was not enough time for Officer Logan to perceive if Ontiveros was a threat.  (Pls' Resp. to Defs' Objections to Evidence 11 n. 1.)

Plaintiffs further allege that the short timeframe creates a strong presumption of a cover-up and argue that a possible cover-up is further supported by the positioning of Ontiveros' boots after the shooting.  Officer Logan testified that he observed one boot in Ontiveros' bedroom after the shooting; Sgt. Bruce, who entered the bedroom immediately after Officer Logan stated that he saw a "pair" of buckskin boots in the room.  (Defs' Mot. Summ. Judg., Ex. B at 443-44.)  When Ranger Cook investigated the incident, he found one boot with blood on it in the closet and one on the ground in the bedroom.  (Cook Dep. 25-26.)  Ranger Cook testified that it was "pretty obvious that the boot got either kicked, moved, knocked, somehow moved to that closet during" Ontiveros' treatment by the Emergency Medical Services team, though he did not confirm this with the EMS team.  (*Id.* at 25-26, 31.)  Plaintiffs' Expert, Ernest Burwell, claims in his report that it "appears that the boots were used as a cover story for shooting an unarmed man," but provides no explanation for this theory.  (Pls' Resp. to Mot. Summ. Judg. Ex. 23.)  Plaintiffs argue that someone likely placed the boot in the closet because Officer Logan's decision to shoot Ontiveros would appear more reasonable if Ontiveros only had one boot in his hand.  This is because, according to Plaintiffs, if Ontiveros had one boot on and one in his hand, it would seem more likely that he was trying to put his boots on rather than reaching for a weapon.  That Ontiveros was likely wearing a boot on his right foot and was putting one on his left foot is further supported, claim Plaintiffs, by the autopsy photo which shows blood on Ontiveros' left foot but not his right.  (Pls' Resp. to Mot. Summ. Judg. Ex. 9-17, 50.)  Whatever the case may be, contend Plaintiffs, the fact that the boot was moved suggests a cover-up.

If Plaintiffs had presented sufficient evidence on which a jury could reasonably find that the events could not have occurred in eight seconds or something more than speculation that a member of the Rosenberg City Police intentionally moved one of Ontiveros' boots in an attempt

to cover up the events that occurred in the mobile home, summary judgment would be inappropriate.  *See Bazan*, 246 F.3d. at 492 ("[D]eciding what occurred when deadly force was employed obviously will control whether the Trooper's conduct was *objectively reasonable*; therefore, those facts are material."(emphasis in original)).  Unfortunately, Plaintiffs do not point to the kind of contradictions in the evidence present in *Bazan*, 246 F.3d at 492-93 (describing lack of evidence corroborating Troopers' account of events leading to shooting and discrepancies in characterization of the events leading up to the shooting) nor do they provide the kind of scientific or forensic evidence that the Court found created a disputed issue of material fact in *James v. Harris County*, No. H-04-3576, 2006 WL 2827050, at *5-6 (S.D. Tex. Sept. 28, 2006) (denying summary judgment in § 1983 case alleging of excessive use of force); *see also Pineda v. City of Houston*, 124 F. Supp. 2d 1037, 1055 (S.D. Tex. 1999) (denying summary judgment in excessive use of force case where Plaintiffs provided autopsy reports and bloodstain analysis contradicting officer's assertion that he aced in self-defense).  Plaintiffs urge that the Court must take a fairly critical view of the evidence in this case because Officer Logan is the sole surviving witness.  *See, e.g., Bazan*, 246 F.3d at 492; *James*, 2006 WL 2827050, at *6.  Although Officer Logan is the only witness to Ontiveros' movements inside the bedroom, his account of the other events leading up to the shooting, including the number of times that he peeked inside the bedroom door and ordered Ontiveros to show his hands, are corroborated by testimony from other officers on the scene.  "At the summary judgment stage, we require evidence—not absolute proof, but not mere allegations either."   *Reese*, 926 F.2d at 499.   Plaintiffs' conclusory allegations regarding the timeframe of the events and speculation as to the placement of the boots simply are not sufficient evidence that would allow a reasonable jury to conclude that the events did not occur as Defendants claim or that the Rosenberg Police engaged in a cover up.

Plaintiffs also point out that the City of Rosenberg's Internal Affairs Report reflects that that, during the autopsy, "[i]t was determined that the deceased was leaning forward or kneeling when he was shot.  This would account for the downward direction of the bullet's path." (Internal Affairs Report  220.)  Ranger Cook also confirmed that, based on the trajectory of the bullet, he believed Ontiveros was "leaning forward" at the time of the shooting. (Cook Dep. 67.) Ontiveros' "leaning forward" position at the time of the shooting seems undisputed.  Plaintiffs contend that Mr. Ontivero's position when shot is more consistent with a finding that he was shot while trying to put on his boots than with a finding that he was reaching into it for an object.  The fact that Ontiveros may have *actually* been trying to put on his boots instead of reaching for a weapon, however, is of little consequence given that the proper inquiry is whether a reasonable officer on the scene could have interpreted his movements as constituting a threat to himself or other officers.  Plaintiffs also argue that Ontiveros' position suggests he was trying to comply with Officer Logan's commands to show his hands or get on the ground at the time of the shooting.  This argument is similarly unavailing.  Mr. Ontiveros' compliance is admittedly material to the determination of whether Officer Logan's actions constituted an unconstitutional excessive use of force.  *See Graham*, 490 U.S. at 396; *Bazan*, 246 F.3d at 492 (finding that dispute over the events leading up to a Trooper' deadly shooting were material to whether the Trooper's conduct was objectively reasonable).  Even if Ontiveros was leaning forward, however, a reasonable officer could have interpreted the totality of his actions as a refusal to comply with orders.  The record shows that Ontiveros shut the door to his bedroom when the SWAT team entered the mobile home, failed to respond to Sgt. Seymour's command to come out, and appeared to be blocking the door when Officer Logan attempted to enter the bedroom. When the door did open, Ontiveros moved out of Officer Logan's line of sight and appeared to

be putting his hand into a boot.  Thus, the autopsy evidence showing that Ontiveros was leaning forward does not create a genuine issue of material fact sufficient to overcome summary judgment.

Because Plaintiffs have failed to provide sufficient evidence that would allow a jury to reasonably conclude that the events did not occur in the way Defendants describe, the Court must consider whether Officer Logan's actions were reasonable presuming that the events occurred as Defendants describe.  Under these circumstances, the Court concludes that Officer Logan's use of deadly force was not a constitutional violation.

Officer Logan was serving a high-risk felony warrant for aggravated assault with deadly weapons on a man who was believed to be intoxicated, had engaged in violent acts the day of the arrest, and had threatened to kill people while brandishing a firearm.  He had been informed that the suspect was likely still in possession of a rifle and a revolver.  After the SWAT team announced "Police" in English and Spanish and made entry into the mobile home, Ontiveros did not come out of the bedroom, but instead closed the door to the room.  Ontiveros did not come out after Sgt. Seymour commanded him to do so, and appeared to block the bedroom door when Officer Logan attempted to enter the room.  When the bedroom door finally swung open, Officer Logan saw Ontiveros holding an object over his head.  Ontiveros then moved out of Officer Logan's line of sight and failed to show his hands in response to Officer Logan's commands. For whatever reason, as Officer Logan peeked into the bedroom, Ontiveros, while leaning forward, held a boot in his hand and reached into that boot with his other hand.  Officer Logan had to make a split-second decision in a tense and uncertain circumstance as to how much force was necessary.  *See Graham*, 490 U.S. at 397.  Though his decision ultimately proved incorrect, under the circumstances described above, an officer could have reasonably believed that

15

Ontiveros posed a threat of serious physical harm to himself or other officers.  *See Saucier v. Katz*, 533 U.S. 194, 195 (2001) ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed.").  Officer Logan's use of force, therefore, did not constitute a constitutional violation.[7]

Of the cases cited in support of this conclusion by Defendants, *Young v. City of Killeen*, 775 F.2d 1349 (5th Cir. 1985) is particularly convincing.  In *Young*, an officer witnessed a suspect participate in a drug transaction and tried to apprehend him.  *Id.* at 1351.  The suspect tried to drive away, but the officer blocked his car with the patrol car and ordered the suspect to exit the vehicle.  *Id*.  Instead of doing so,  Young "apparently reached down to the seat or floorboard of his car and [the officer], believing Young  had a gun, fired his own weapon."  *Id.* The Fifth Circuit in *Young* concluded that "If Young's movements gave Olson cause to believe that there was a threat of serious physical harm, Olson's use of deadly force was not a constitutional violation."  *Id.* at 1353; *see also Reese*, 926 F.2d at 500-01 (upholding a finding that an officer's use of deadly force was reasonable where, following a high-speed chase, the plaintiff twice reached down in the car, below the officer's line of sight,  which could have reasonably been interpreted as reaching for a weapon); *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (finding reasonable an officers' use of deadly force against a suspect who failed to respond to orders to show his hands and held an object in his left hand that led the officer to believe the suspect was coming at him with a weapon).  Because Ontiveros' movements could have been interpreted as threatening, particularly given what the officers knew about the nature

---

[7] Even if the danger could be construed as created by Officer Logan or the SWAT team's negligence, as long as Ontiveros' actions gave Officer Logan cause to believe that there was a threat of serious physical harm, the use of deadly force does not constitute a constitutional violation. *See Fraire*, 957 F.2d at 1275-76 (rejecting an argument that force was excessive based, in part, on an argument that officer manufactured the circumstances giving rise to the shooting); *Young v. City of Kileen*, 775 F.2d 1349, 1353 (5th  Cir. 1985).

of his alleged crime and his possession of two firearms, Officer Logan, like the officer in *Young*, did not commit a constitutional violation by using deadly force. [8]

### D.    Qualified Immunity

Because the Court finds that Officer Logan's actions did not violate a constitutional right, it need not determine whether Officer Logan was entitled to qualified immunity. *Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").  Even if Officer Logan's actions could be construed as constituting a constitutional violation, however, the Court finds that he would have been entitled to qualified immunity.

After finding a constitutional violation occurred, "the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.  The Court must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* "A right is clearly established if its 'contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Johnson v. Waters*, 317 F. Supp. 2d 726, 731 (S.D. Tex. 2004) (citing *Saucier*, 533 U.S. at 202); *see also Mendenhall v. Riser*,  213 F.3d 226, 230 (5th Cir. 2000) ("[A]ny purported harm must stem from rights clearly established under law at the time of the incident, and the contours of that right must be sufficiently clear such that a reasonable officer would understand that his actions were violative of the right at

---

[8] Plaintiffs' expert, Ernest Burwell, opines that, even if the events took place in the way Officer Logan describes, it was unreasonable for Officer Logan to shoot in response to Mr. Ontiveros' action of reaching into the boot.  Even if the Court were to find Mr. Burwell's testimony admissible under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), something Defendants vigorously contest, it is not compelled to reach the same conclusion on this question of law.  The Court does not agree with Mr. Burwell's that finding Officer Logan's actions reasonable means that an officer is "always free to shoot unarmed suspects."  The circumstances of this case, including Mr. Ontiveros' violent actions earlier in the day, known possession of firearms, and actions that a reasonable officer could have interpreted as failure to comply, together with his reaching into an object large enough to conceal a firearm, will not be present in every case involving an unarmed suspect.  Furthermore, contrary to Mr. Burwell's opinion, the Fifth Circuit has not held that an officer must wait for a suspect to display a deadly weapon before he may respond with deadly force.

issue.").  The dispositive inquiry is, therefore, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier*, 533 U.S. at 202.  If Officer Logan "reasonably but mistakenly" thought the use of deadly force was legal under the circumstances, he would be entitled to immunity.  *Saucier*, 533 U.S. at 205 ("An officer might correctly perceive all the facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense."); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Saucier*, 533 U.S. at 202 (citing *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

Under the circumstances of this case,  it would not necessarily have been clear to a reasonable officer that his conduct was unlawful in this situation.  To find that "no reasonable officer could have believed" that Officer Logan's use of force was consistent with the Constitution would require a very different showing from that which Plaintiffs have made. *Mendenhall*, 213 F.3d at 231; *see also Malley*, 475 US at 341 (if "officers of reasonable competence could disagree" as to whether a use of force was reasonable under the circumstances, "immunity should be recognized."); *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994).  Given the violent nature of Ontiveros' crimes, the fact that he was known to possess two firearms and had threatened to use them earlier in the day, and the fact that he moved out of Officer Logan's line of sight and  appeared to be reaching into a boot at the time of the shooting,

Officer Logan's mistake as to whether the law allowed him to use deadly force against Ontiveros when he reached into his boot was reasonable in light of cases such as *Young*, 775 F.2d at 1351, 1353. Thus, even if Officer Logan's actions constituted an unconstitutional use of excessive force, he would be entitled to summary judgment on grounds of qualified immunity.

Plaintiffs argue that several cases compel a different conclusion.[9] Although none involve exactly the same facts, the most similar case is *Johnson v. Waters*, 317 F. Supp. 2d 726 (S.D. Tex. 2004).[10] Even *Johnson*, is clearly distinguishable, however.[11] In *Johnson*, an officer shot an unarmed woman who lay in her bed and showed no sign whatsoever of resistance. 317 F. Supp. at 735. Unlike the case at hand, there was no evidence that Ms. Johnson "committed a crime involving the infliction or threatened infliction of serious physical harm." *Id.* The record also reflected that the Constable fired a shot simultaneously while yelling "Freeze" and without having any idea who she was or what threat she posed. *Id.* at 736. *Johnson* does not, therefore, counsel a finding that Officer Logan's actions were unreasonable or that he is not entitled to qualified immunity.

###    E.    Claims Against the City of Rosenberg

---

[9] In several of the cases cited by Plaintiffs, the district court refused to grant summary judgment for defendants on qualified immunity grounds because a genuine issue of material fact existed as to whether the officer saw the suspect with a weapon, whether the suspect complied with the officer's commands or otherwise resisted arrest, and whether the officer actually acted in self-defense. *See, e.g.*, *James v. Harris County*, No. H-04-3576, 2006 WL 2827050, at  *5-6 (S.D. Tex. Sept. 28, 2006); *Holland v. City of Houston*, 41 F. Supp. 2d 678, 695-97 (S.D. Tex. 1999); *Pineda v. City of Houston*, 124 F. Supp. 2d 1037, 1054-55 (S.D. Tex. 1999). The Court has found that no such dispute exists in this case.

[10] At a hearing on the pending motion, Plaintiffs indicated that *Ham v. Brice*, 203 Fed. Appx. 631 (5th Cir. Oct. 25, 2006) (not selected for publication) was particularly relevant. *Ham* involves very different facts than those presented here. In *Ham*, an officer shot a plaintiff known to be unarmed as he was running away. *Id.* at *635. Although the officer claimed he feared the plaintiff was running towards an unlocked police vehicle that contained weapons, investigators could not confirm that allegation. *Id.*

[11] The district court in *Johnson* assumed without finding that the plaintiffs' version of the facts would constitute a constitutional violation. *Johnson*, 317 F. Supp. 2d at 735.

Because the Court finds that Officer Logan did not commit a constitutional violation, the City cannot be held liable under § 1983 for ratification of Officer Logan's act.[12]  Even if Officer Logan's acts were considered to violate the Constitution, however, the City of Rosenberg would not be liable for its alleged ratification of Officer Logan's acts because Plaintiffs have not shown that this failure was anything but an isolated decision to discipline a single officer for a single incident of illegality.

Although a municipality can be found to have an unconstitutional custom or policy based on its failure to discipline an officer after he commits an unconstitutional act, the Fifth Circuit has made clear that such a policy "cannot be inferred from a municipality's isolated decision not to discipline a single officer for a single incident of illegality."  *Berry v. McLemore*, 670 F.2d 30, 33 -34 (5th Cir. 1982), *overruled on other grounds by International Woodworkers of America, AFL-CIO and its Local No. 5-376 v. Champion Intern. Corp.*, 790 F.2d 1174 (5th Cir. 1986); *see also Fraire v. City of Arlington*, 957 F.2d 1268, 1278-79 (5th Cir. 1992); *Lopez-Rodriguez v. City of Levelland, Texas*, 100 Fed. Appx. 272, 274 (5th Cir. June 3, 2004) (not selected for publication) ("We will not infer an unconstitutional custom or policy from a municipality's failure to discipline an officer for a single incident.").  Plaintiffs' reliance on *Rivera v. City of San Antonio*, No. SA-06-CA-235-XR, 2006 WL 3340908 (W.D. Tex. Nov. 15, 2006) is misplaced.  Unlike *Rivera*, where Plaintiffs alleged that the San Antonio Police Department had received "hundreds of complaints involving the use of excessive force by police officers without ever having taken disciplinary action," *id.* at *12, Plaintiffs in this case point only to Police Chief Gracia's willingness to reinstate and ultimately promote Officer Logan after the conclusion of his six weeks of administrative leave as evidence of the City's alleged unconstitutional custom

---

[12] At a hearing on the pending motion, Plaintiffs clarified that they only wished to proceed against the City of Rosenberg for its alleged ratification of Officer Logan's acts.

or policy.  This is precisely the kind of isolated incident that the Fifth Circuit has clearly held insufficient to support municipal liability under § 1983.

## III.    CONCLUSION

The Court finds that Officer Logan's use of force was not unreasonable under the circumstances and did not constitute a constitutional violation.  Even if Officer Logan's use of force could be construed as a constitutional violation, he would be entitled to qualified immunity. Because his use of force did not constitute a constitutional violation, the City of Rosenberg cannot be held liable for ratifying Officer Logan's actions.  Even if Officer Logan's use of force constituted a constitutional violation, the City of Rosenberg would not be liable under Plaintiffs' ratification theory because Chief Gracia's failure to discipline Officer Logan was an isolated decision to discipline a single officer for a single incident of illegality.  As a result, Defendants' Motion for Summary Judgment is hereby **GRANTED** as to Plaintiffs' § 1983 claims.  Plaintiffs' request to dismiss their state law claims without prejudice is also **GRANTED**.

**IT IS SO ORDERED.**

**SIGNED** this 31st day of  January, 2008.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT